**SIDCO PRODUCTS MARKETING, INC., Plaintiff–Appellant,**

v.

**GULF OIL CORPORATION, Defendant–Appellee.**

**No. 87–6172.**

United States Court of Appeals, Fifth Circuit.

Nov. 1, 1988.
Rehearing Denied Nov. 30, 1988.

Michael Connelly, Elena Maslia Marks, Houston, Tex., for Sidco Products Marketing, Inc.

James E. Smith, Robert J. Malinak, Houston, Tex., for Gulf Oil Corp.

Before REAVLEY, JOHNSON, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

At issue here is the grant of summary judgment for the defendant concerning claims for breach of express and implied warranties and violation of the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA), Tex.Bus. & Com.Code Ann. §§ 17.41–17.63 (Vernon 1968), in the sale of a material called "middle layer emulsion" (MLE). Texas law applies in this diversity case. Concluding essentially that Gulf did not misrepresent the nature or qualities of MLE to the ultimate purchaser Sidco, we affirm.

## I. BACKGROUND

According to Sidco, this is the story of a pig in a poke.[1] On December 15, 1983, Gulf published a Bid Inquiry in which it invited bids from a selected group of purchasers for a product called "middle layer emulsion." One company on the bid list

---

1. Our statement of facts derives, in accord with standard summary judgment procedure, from uncontested propositions appearing in the trial court record.

was Chemwaste, Inc. Several portions of the Bid Inquiry are relevant to our discussion. First, the product was defined as Middle Layer Emulsion, "a mixture of oil, water and particulate matter." Second, paragraph 10 of the Bid Inquiry afforded any prospective purchaser the opportunity to "inspect the tanks containing MLE and ... obtain a reasonable sample therefrom for testing." The bid price was to be gauged by the value of recoverable hydrocarbons estimated to be contained in the MLE. Third, a cautionary environmental note appeared as paragraph 14 of the Bid Inquiry:

> The solids in the middle layer emulsion are listed by the United States Environmental Protection Agency in 40 CFR Part 261 as a "Hazardous Waste from Specific Sources, Slop Oil emulsion solids from the petroleum refining industry" with an EPA hazardous waste number of K049. If the solids are removed from the middle layer emulsion, then the disposal of these solids are regulated by the Federal Government as well as many state and local governments. It will be the responsibility of the successful bidder to dispose of these solids and any waste water generated in accordance with all applicable Federal, State and Local rules and regulations.

Sidco became interested in purchasing MLE for processing and resale of the oil in it when its president, Dirk Stronck, obtained and read a copy of the Bid Inquiry, including paragraph 14. Because Gulf was selling the product only to authorized bidders, Stronck contacted Romero Brothers Oil Exchange, Inc., which acquired from Chemwaste the right to sell MLE. Sidco availed itself of the opportunity to examine MLE chemically and engaged E.W. Saybolt & Company, Inc. for this purpose. Upon receipt of what it believed were satisfactory test results from Saybolt, Sidco signed a contract to purchase the MLE from Romero. The Romero contract was executed for Sidco by Ron Bougere, its then-vice-president.

The sale from Gulf to Chemwaste, thence to Romero and Sidco, occurred January 24, 1984. Sidco paid $394,482 for MLE estimated to yield 28,077 barrels of recoverable hydrocarbons. Sidco then entered into a processing agreement with Texas Oil and Chemical Terminal, Inc. for "slop oil" without showing TOCT the Bid Inquiry or advising it that the product was MLE. TOCT's attempts to process MLE encountered serious difficulty—the product first plugged a pump screen and damaged TOCT's heater and later clogged a processing tower.

After further testing, Sidco was led to inquire of the Texas Department of Water Resources whether MLE might be a "hazardous waste" regulated by federal environmental law. The department answered affirmatively. Gulf protested this decision, but was ordered to and did remove the MLE from the TOCT refinery, which was not licensed to process hazardous waste, and paid for repairs to TOCT's heater. Nevertheless, hydrocarbon products were eventually extracted and sold by Sidco for gross revenue exceeding $400,000.

Sidco claims to have sustained over $13 million in damages, including $60,000 out-of-pocket costs, over $360,000 in lost revenues, the loss of $5 million in financial backing for proposed slop oil activities, and foregone business opportunities exceeding $8.6 million.

Sidco's lawsuit against Gulf [2] alleged the following causes of action:

1. Gulf breached an express warranty regarding the nature and quality of MLE, in violation of Tex.Bus. & Com. Code Ann. § 2.313;

2. Gulf breached the implied warranty of merchantability in that MLE was not fit for the purpose for which slop oil is ordinarily sold, violating Tex.Bus. & Com.Code Ann. § 2.314;

3. Gulf's misrepresentations and omissions constitute false, misleading and deceptive acts contrary to the DTPA, Tex. Bus. & Com.Code Ann. §§ 17.46(b)(5), (7), (12), and (23); and

---

**2.** Sidco also sued Saybolt and Nalco, a chemical supply house which had participated in the processing of MLE, but it settled with both those parties and dismissed them.

4. Gulf's breaches of express and implied warranties and unconscionable conduct likewise violate DTPA §§ 17.50(a)(2) and (3), respectively.

■ To allege is not to prove the validity of a plaintiff's claims, of course. After voluminous discovery sufficient to prepare the case for trial, the district court ruled Sidco's proof deficient and summary judgment warranted for two reasons. The court found that Gulf did not misrepresent the MLE because its Bid Inquiry accurately represented the characteristics of MLE and warned prospective buyers that the solids contained in the MLE were hazardous waste. The court also found that any damages Sidco sustained were caused by its own internal miscommunications concerning the nature of MLE. We may affirm the district court's summary judgment on any basis that was argued below and finds support in the record. *SEC v. Southwest Coal & Energy Co.*, 624 F.2d 1312, 1317 (5th Cir.1980).

## II. DISCUSSION

The determination most critical to the success of Sidco's position is the nature of the misrepresentations or omissions by Gulf in its Bid Inquiry. Sidco concedes that the Bid Inquiry constitutes the only relevant communication between Gulf and Sidco's representatives prior to Sidco's purchase of MLE. Sidco charges that Gulf misrepresented three characteristics of the MLE: that it formed an unusually tight emulsion which was not susceptible to ordinary processing methods; that the product was not "ordinary slop oil," and that the product in its totality was a hazardous waste under applicable environmental regulations. Sidco alleges that all of its damages flowed from these misrepresentations. Sidco's breach of warranty claims, and its alleged breach of the DTPA founded on warranty and misrepresentation claims, depend upon the existence of these pleaded and vigorously argued misrepresentations of MLE's qualities.

Try as we may, we are unable to discern in the bare simplicity of Gulf's Bid Inquiry the false representations that Sidco asserts. The pertinent portions of the Bid Inquiry were quoted above. MLE is there described as an emulsion, which the dictionary alerts us is an "intimate mixture" of two incompletely miscible liquids, such as water and oil, or of a semisolid or solid dispersed in a liquid. *Webster's Third New Int'l Dictionary*. The MLE is defined to contain water, hydrocarbons and particulate matter. Prospective purchasers are offered the opportunity to sample a sufficient quantity of the MLE to determine its qualities. Finally, there is a cautionary note about the hazardous waste nature of solids contained in the MLE. There is, however, no affirmation of fact concerning the susceptibility of MLE to any particular hydrocarbon processing or refining technique. There is no representation that MLE is "ordinary slop oil." The term slop oil appears only once in the Bid Inquiry, as a descriptive term (in paragraph 14) in the title of the EPA regulation governing the nature of the solids.[3] MLE itself is not represented in the Bid Inquiry as either environmentally hazardous or non-hazardous. The Bid Inquiry did, however, put the would-be purchaser on notice that he should sample and test the MLE in order to determine the nature and quantity of its hydrocarbon content and to calculate his bid price. To put the matter briefly, the Bid Inquiry described MLE much as would a want-ad for a "truck," in that it described the product generically and left the rest of the characteristics to be discerned by the purchaser in his test-drive or at his mechanic's shop.

■ A warranty is a promise or affirmation of fact concerning a product or a description of the product to which the product is represented to conform. Tex. Bus. & Com.Code Ann. §§ 2.313(a)(1) and (2). Gulf's Bid Inquiry made no promise or description of MLE with regard to its processability or its status as either "ordinary slop oil" or an EPA-regulated hazardous

---

**3.** Moreover, in the contract that Sidco executed with Romero to purchase the product, it is defined as "Gulf Oil Middle Layer Emulsion," and the term slop oil never appears.

waste. Where there is no such representation, promise, or affirmation that becomes part of the basis of the parties' bargain, there is no express warranty to be breached. *La Sara Grain Co. v. First National Bank*, 673 S.W.2d 558, 565 (Tex.1984).

■ Sidco responds to this conclusion in two ways, which we believe are but versions of the same argument. Gulf, it says, "by its conduct" as well as by the Bid Inquiry, "acted as if" MLE was ordinary slop oil. Alternatively, the essence of Gulf's duplicitous conduct, Sidco contends, is that Gulf *omitted* to disclose that MLE could not be processed by ordinary refinery means, that it was not ordinary slop oil, and that it was, irrespective of the solids it contained, a hazardous waste. Omissions, however, are not affirmative representations of any sort and thus cannot support a warranty claim, because express warranties must be explicit. *S. I. Property Owners' Assoc. v. Pabst Corp.*, 714 S.W.2d 358, 361 (Tex.App. Dallas 1986, writ ref'd). On the record before us, it appears that Gulf's Bid Inquiry embodied no express warranty concerning the processability of MLE or its status as "ordinary slop oil" or a non-hazardous material.

■ Sidco also contends that MLE was sold under an implied warranty of merchantability or fitness for the purposes for which "ordinary slop oil" is used. Gulf moved for summary judgment on this issue, asserting that slop oil is bought and sold so that it can be processed to yield valuable petroleum products. Since the MLE did eventually produce $400,000 of such products for Sidco, the implied warranty of merchantability was fulfilled. This argument suffers from the lack of record evidence demonstrating that, if MLE were to be equated to "ordinary slop oil" for implied warranty purposes, the revenue earned for its petroleum contents represented a "quality comparable to that generally acceptable in that line of trade ..." Official Comment 2 to Tex.Bus. & Com. Code Ann. § 2.314. Alternatively, however, Gulf asserts that there can be no implied warranty of merchantability as requested by Sidco, because Gulf nowhere expressly represented MLE as "ordinary slop oil." We find this latter rationale convincing and consistent with our previous discussion.

■ The Texas DTPA creates a statutory cause of action for breach of warranty, Tex.Bus.Com.Code Ann. § 17.50, but because the DTPA neither creates nor defines a warranty, its existence must be established independently. *La Sara Grain*, 673 S.W.2d at 565. Having failed to establish a genuine fact issue concerning Gulf's breach of an express or implied warranty, Sidco has no DTPA action founded on warranty.

■ Our conclusion that Gulf did not warrant MLE as ordinary slop oil, non-hazardous, and amenable to ordinary distillation refining also resolves Sidco's claims for misrepresentation under the DTPA.[4] The DTPA provisions deal with representations of a product's characteristics or quality which are inaccurate.[5] Because we have concluded that Gulf did not make inaccurate representations about MLE, there is accordingly no basis for DTPA misrepresentation liability.

■ The next Sidco domino that falls is its claim that Gulf's omissions of critical characteristics of MLE violated § 17.46(b)(23) of the DTPA. This provision labels as an actionable deceptive practice:

---

4. As Sidco points out, it did not plead common-law claims of fraudulent misrepresentation or omission, so Gulf's arguments against such claims seem misdirected.

5. Section 17.46(b) lists actionable deceptive trade practices. Section 17.46(b)(5) covers "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, sta-

tus, affiliation, or connection which he does not."

Section 17.46(b)(7) covers "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

Section 17.46(b)(12) covers "*representing that an agreement* confers or involves rights, remedies, or obligations *which it does not have* or involve, or which are prohibited by law." (emphasis added)

the failure to disclose information concerning goods or services which was known at the time of the transaction if *such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.* (emphasis added)

Citing no authority, Sidco contends that this provision permitted it to have a jury determine whether Gulf's "meaningless" Bid Inquiry "fairly described the MLE." A fair description of products may be the goal toward which § 17.46(b)(23) points. *See, e.g., Gibbs v. Main Bank of Houston,* 666 S.W.2d 554, 558 (Tex.Civ.App. Houston (First Dist.) 1984, no writ) (title company's failure to disclose outstanding lien on property is actionable DTPA nondisclosure). The provision is not, however, as open-ended as Sidco suggests, because it also requires intentional omission of a material fact by a Seller for the purpose of duping the consumer. *Parks v. U.S. Home Corp.,* 652 S.W.2d 479, 485 (Tex.Civ.App. Houston (First Dist.) 1983, no writ). The seller must have known of the defect, *Robinson v. Preston Chrysler–Plymouth Inc.,* 633 S.W.2d 500, 502 (Tex.1982). The seller must have intended to deceive the consumer. *Parks, supra.* We may assume *arguendo* except for its status as a hazardous waste that the characteristics of MLE identified by Sidco are material and that Gulf knew of their existence when it sold MLE to Sidco. Nevertheless, there is no evidence that Gulf intentionally omitted material information about MLE with nefarious motives.

Gulf offered purchasers the opportunity to sample and test MLE as they chose, so they could independently evaluate its characteristics. There is no evidence that Gulf refused to speak with Sidco or to answer inquiries concerning MLE—it appears, rather, that no overtures were made by Sidco. There is no evidence that Gulf believed its purchasers would be unable to determine the processing requirements for MLE[6] or its recoverable petroleum con-

tents or any environmentally hazardous components by means of appropriate testing. The transaction price was determined, not by Gulf, but by Sidco's estimate of the quality and amount of recoverable petroleum products.

The district court declined to rule on whether MLE was itself a hazardous waste. We decline as well. Even if MLE is a hazardous waste, Sidco has introduced no evidence that would show that Gulf believed it to be a hazardous waste at the time it prepared the Bid Inquiry. In fact, Sidco argued in its brief in opposition to summary judgment that:

> Gulf cannot argue in good faith that the Bid Inquiry should have put Sidco on notice that the MLE was a hazardous waste when Gulf specifically intended for the bid inquiry not to do so. *It was Gulf's position in December 1983 that MLE was not a hazardous waste. Certainly Gulf would not have stated in its Bid Inquiry, expressly or by implication, that the MLE was a hazardous waste.*

(emphasis added). Nor is this position inconsistent with Gulf's attempt to delist as non-hazardous some of the components of MLE. Gulf acknowledged that certain solids in MLE were classified as EPA hazardous wastes, but has consistently maintained that MLE itself is not a waste, and thus, not a hazardous waste. Without evidence that Gulf believed MLE to be a hazardous waste, Sidco cannot prove that Gulf could have intended to dupe Sidco about its status.

On this issue of Gulf's knowledge that MLE was hazardous waste, as well as on the other subsidiary facts that could have led to an inference of Gulf's intention to omit salient characteristics of MLE from its description in the Bid Inquiry, Sidco had the burden in opposing summary judgment to set forth some evidence. *Celotex Corp. v. Catrett,* 477 U.S. 317, 108 S.Ct. 2548, 71 L.Ed.2d 265 (1986). We cannot find the evidence that raises a material fact issue on the DTPA omission claim.

---

**6.** A witness employed by Sidco's processor TOCT stated that had they been informed that MLE was an emulsion, they would have refused

to process it. This statement verifies the accuracy of the Bid Inquiry and is probative of Sidco's unilateral misunderstanding of MLE.

The final claim asserted by Sidco alleges the "unconscionability" of Gulf's "conduct in marketing and misrepresenting MLE" contrary to DTPA § 17.50(a)(3). Unconscionability is defined by the DTPA as any act or practice that, to a person's detriment:

(A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or

(B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

It is important to note that unconscionability is defined not in terms of the defendant's intent or conduct, but according to the objective result of the transaction. The Texas Supreme Court so observed in *Chastain v. Koonce*, 700 S.W.2d 579, 583 (Tex. 1985):

A consumer's proof of gross disparity under subdivision B does not require proof that the defendant acted intentionally, knowingly or with conscious indifference. Likewise, a consumer's proof of gross unfairness does not require proof that the defendant acted intentionally or knowingly to bring about the result.

Sidco's complaints about Gulf's "entire course of conduct" do not bear upon the statutory definition of unconscionability.[7] Examining the MLE sale as the statute and *Chastain* require, we are unable to conclude that it was unconscionable. The statute mandates a gross disparity between the value of MLE as received and the consideration paid. Sidco does not dispute that it sold the MLE's recoverable petroleum products for more than it paid for the MLE. There can be no gross disparity in this situation. *See Chastain*, 700 S.W.2d at 583. Further, we fail to see how Sidco

can imply that Gulf took grossly unfair advantage of Sidco because of any disparity in bargaining capacity between them. Sidco had the opportunity to test MLE without limit, Sidco is a company engaged in the resale of petroleum products, and Sidco employed people with sufficient expertise to evaluate MLE properly. The uncontested facts suggest that Gulf did not take advantage of Sidco at all, much less that it grossly abused its position.

For these reasons, the summary judgment granted by the district court is AFFIRMED.

---

7. The cases cited in Sidco's reply brief for the proposition that a "course of conduct" may be unconscionable are readily distinguishable, because the defendants' course of conduct demonstrated the grossly unfair advantage or power they were exerting over defenseless and often unsophisticated consumers. *See, e.g., Bennett v. Bailey*, 597 S.W.2d 532 (Tex.Civ.App. Eastland 1980, writ ref'd nre) (dance studio tricked widow into paying $29,669.45 for dance lessons and trips, injured her foot and later broke two of her ribs, and then canceled her trips); *Franks v. Associated Air Center, Inc.*, 663 F.2d 583 (5th Cir.1982) (aircraft repair company spent a couple of hours to fix a landing gear door, but broke the landing gears, did not fix the door, and charged $2,175.00 for labor.)