966 F.Supp. 1509 (1997)
CAMBRIDGE ENGINEERING, INC., Plaintiff,
v.
ROBERTSHAW CONTROLS COMPANY, Defendant.
No. 4:90 CV 1407 DDN.
United States District Court, E.D. Missouri, Eastern Division.
April 15, 1997.
*1510 *1511 Peter C. Woods, Kohn and Shands, St. Louis, MO, Timothy Belz, Principal, Ottsen *1512 and Mauze, St. Louis, MO, for Cambridge Engineering Inc.
Linda Carroll Reisner, W. Stanley Walch, Bryan L. Sutter, Thompson Coburn, St. Louis, MO, for Robertshaw Controls Co.

OPINION
NOCE, United States Magistrate Judge.
This action is before the court following a non-jury trial. Plaintiff Cambridge Engineering, Inc., (Cambridge) has brought this judicial action against defendant Robertshaw Controls Company (Robertshaw) for monetary damages. The parties consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c)(3). This court has subject matter jurisdiction over the action under 28 U.S.C. § 1332.
Earlier in this action the Court sustained defendant's motions for summary judgment on plaintiff's third amended complaint claims for negligence (Count I), breach of implied warranty (Count II), breach of implied warranty of merchantability (Count III), and strict liability (Count IV). Now before the Court for determination are plaintiff's claims of fraudulent misrepresentation and concealment (Count V) and breach of express warranty (Count VI). Plaintiff seeks substantial actual and punitive damages.
Plaintiff's claims arose out of its purchase from defendant of ignition control modules used by plaintiff in the manufacture of direct-fired gas heaters.
From the evidence adduced during the trial, the Court makes the following findings of fact and conclusions of law:

FACTS
1. Plaintiff Cambridge Engineering, Inc. (Cambridge) is a Missouri corporation with its principal place of business located in St. Louis County, Missouri.
2. Defendant Robertshaw Controls Company (Robertshaw) is a Delaware corporation with its principal place of business located in Richmond, Virginia.
3. Cambridge designs, manufactures, and sells direct-fired gas heaters for use in warehouses, factories, and other commercial and industrial buildings. Cambridge has approximately twenty-six competitors in the direct-fired gas furnace industry.
4. The heaters and furnaces manufactured by Cambridge operate as follows: when the operating thermostat inside the building, or other electrical interlock, signals the heater to start its heating cycle, the heater's blower comes on and draws air in from outside the building. It then blows the air over a gas burner and out into the area to be heated. After the blower starts, a hot surface igniter is energized for seventeen seconds, allowing it to reach a temperature hot enough to ignite the natural gas fuel. Then a gas valve opens, letting gas into the burner, where it is lit by the hot surface igniter. Once the presence of flame is detected, the electrical current to the hot surface igniter is turned off, the gas burner continues burning, and the blower continues to operate, until the thermostat or other interlock cycles off the heater. This sequence is dictated by an electronic device known as an ignition control module which Cambridge purchases from manufacturers such as Robertshaw.
5. During the relevant time period, Cambridge manufactured and sold three differently sized models of its heaters. The series CH110, which has a burner approximately ten inches wide, is the smallest model. The series CH115, which has a burner approximately fifteen inches wide, is the mid-sized model. The series CH120, which has a burner approximately twenty inches wide, is the largest model. Only the Cambridge heaters use a "blow-through" design. With a blowthrough design, the fan is between the air intake and the burner. The more common draw-through design, employed by Cambridge's competitors, places the fan after the burner. The blow-through design allows Cambridge's heaters to be physically smaller and lighter.
6. The fuel ignition system in Cambridge's heater is comprised of (a) a hot surface igniter which ignites the natural gas fuel (much like a car lighter ignites a cigarette), (b) a flame sensing rod, (c) an ignition control module, and (d) other wiring and *1513 circuitry. The ignition control module (control) is an electric switch which, among other things, routes electrical power to the igniter when the thermostat calls for heat and then turns off the power after a period of time which is normally sufficient for the gas to ignite. If the remote sensor fails to detect flame in the gas burner, the control switches off the electricity to the gas valve causing the gas fuel source to shut off. If flame is detected, the control keeps the electricity flowing to the gas valve, which continues the flow of gas, until the thermostat signals the completion of the heating cycle.
7. The Simicon Division of Robertshaw designs, manufactures, and sells controls and has its headquarters in Holland, Michigan. Robertshaw controls are most frequently used in residential furnace units.
8. White-Rodgers is a division of Emerson Electric Company (White-Rodgers) which also designs, manufactures, and sells similar controls.
9. As early as 1986, Cambridge decided to seek Factory Mutual (FM) underwriters certification for each of the component parts of its direct-fired gas heaters, including the heater controls. FM is an insurance underwriter with its own certification laboratories. Cambridge believed that obtaining FM certification of its heaters would create a marketing advantage in selling its heaters, because it would help Cambridge's potential customers reduce their own insurance costs.
10. In 1987, Gary Potter, Cambridge's vice-president of engineering who has a degree in electrical engineering, asked White-Rodgers to obtain FM certification for its controls in exchange for Cambridge's agreement to purchase its controls from White-Rodgers. White-Rogers originally agreed to obtain FM certification for its control on behalf of Cambridge. Although Cambridge had manufactured direct-fired heaters since the 1960s, Cambridge began producing heaters with hot surface ignition systems in 1987. More specifically, Cambridge started using hot surface igniters in its CH110 heater in September of 1987, and in its CH115 heater in December of 1987. Cambridge had previously used a spark ignition system.
11. In 1987, Donald Naab, a Robertshaw official, learned from igniter suppliers that hot surface igniters which remain powered in the presence of gas or flame will fail more quickly than if they are not kept on in the presence of gas or flame.
12. In early 1988, Potter learned that White-Rodgers had failed to submit its control to FM for certification and would not do so. Potter then contacted Richard Little, Robertshaw's St. Louis area salesman, and asked him whether Robertshaw would obtain FM certification for its control on behalf of Cambridge, if Cambridge would purchase Robertshaw's HS780 control modules. During this conversation, no one at Robertshaw told Potter that the Robertshaw control was the "functional equivalent" of or a "direct replacement" for the White-Rodgers control.
13. By May 1988 Potter had become familiar with a document which Robertshaw's Grayson Controls Division published in May 1986 regarding its Unilogic V Hot Surface Direct Ignition System, which included the HS780 control. This document is composed of a general description of the products, a specific description of the products' features, component descriptions, drawings, operation, installation and servicing instructions, and start-up and check-out procedures. The first section on the first page of the document states in pertinent part:
The Robertshaw Unilogic V Electronic Hot Surface Direct Ignition System is applicable to gas fired heating systems of many types .... the system acts on a demand for heat by a switch or thermostat to supply power to the ignition control. On the non-prepurge model the ignitor will be energized immediately. There is a 34 second delay provided on the prepurge model. After a few seconds the ignitor will begin to glow, and in approximately 34 seconds the gas valve is opened supplying gas to the main burner. After several seconds the ignitor is turned off and the sensor is energized. As long as the main burner flame is sensed, the system continues to operate. When the thermostat is satisfied, *1514 both valves in the gas control will be closed to shut off the main burner.
See Pl.Exh. 25 at 1.
14. The White-Rodgers control and the Robertshaw control are both hot surface ignition controls designed to work with a hot surface igniter. The White-Rodgers and Robertshaw controls are competitive products. Cambridge had previously sent a Robertshaw model HS790 control to the American Gas Association (AGA) for alternative component testing on its heaters in 1987. At that time, AGA approved the use of the Robertshaw control in Cambridge's furnaces as an alternative to the White-Rodgers control.
15. In May 1988, after speaking with Little, Potter spoke with Ron Weerstra, Robertshaw's Simicon Division Product Manager, and Fred Geary, Robertshaw's Senior Design Engineer, prior to purchasing the Robertshaw controls. Fred Geary had designed both the HS790 and the HS780 controls. Potter told Weerstra he was interested in purchasing the HS780 control if Robertshaw would pay for FM certification. During that conversation, Weerstra asked Fred Geary, Robertshaw's engineer who designed the HS780, to join the telephone conversation. Potter then told Geary and Weerstra that he was using the Robertshaw control with a 24-volt igniter. Geary stated to Potter that the Robertshaw HS780 control might not be suitable for use in a 24-volt system. Weerstra informed Potter that Robertshaw was concerned about the reliability of its control in Cambridge's application and that Robertshaw had never tested its control in a heater like Cambridge's. Potter asked Robertshaw to telefax him a quote immediately because Cambridge was behind on its internal deadline of May 13, 1988, for obtaining a commitment from a control supplier who would obtain FM certification for its control on Cambridge's behalf. Weerstra agreed to fax a quotation to Potter, but told Potter that Robertshaw would require a contractual disclaimer, because it was concerned about how the Robertshaw control would work in Cambridge's heater.
16. On May 27, 1988, Fred Geary issued a 13-page technical document captioned "Circuit Operational Description," regarding the HS-780 Hot Surface Control. At great length, with diagrams, schematics, and technical language, the document describes the proper operation of the HS780. Pl.Exh. 26. The document also describes the effects of two types of service interruptions, one caused by momentary electrical power interruption and the other caused by a momentary gas service interruption. Id. at 8. Regarding momentary electrical power interruption, the document states:
If, operating in mid cycle, as indicated above, a momentary power interruption occurs, consisting of approximately 5 line cycles or more, the control will reset back to its initial beginning condition of count one, and resume operation as if the thermostat had just been closed for the first time. The divide by fourteen counter will be reset as a result of the action of the capacitor resistor network C2, R19. Capacitor C4 will be discharged by the circuit consisting of R17, C3, D13, and Q5.
Id. On June 13, 1988, Robertshaw sent a copy of this document to all of its salesmen. It was described to them as being in much greater detail than the primer on the HS780 control, also authored by Geary and previously sent to the salesmen. Id. at 1.
17. Also, on May 27, 1988, Robertshaw issued its quotation to Cambridge. The Quotation provided that Cambridge would purchase a minimum of 3,000 controls (Model No. HS780/17-NR108A) within three years at a price of $18.48 per unit.
18(a). The first page (front) of the Quotation document, also contained the following terms:
This price is based upon the following terms.
1. Minimum quantity of 3,000 to be purchased within a 3 year period.
2. Robertshaw will apply for recognition by Factory Mutual Underwriters at no cost to Cambridge Engineering, Inc.
3. Price includes the ignition module only. All associated wirings, ignitors, and hardware are to be supplied by the customer.

*1515 4. Robertshaw Controls Company will supply the specified control to published specifications and is not responsible for the suitability of the control to any specific application by its customers.
Terms and Conditions
Notwithstanding any inconsistent or additional terms that may be embodied in your purchase order, seller will accept your order subject only to the terms of the written contract between us under which your order is placed. If no such order exists, seller will accept your order only on the express condition that you assent to the terms and conditions contained above and on the reverse side hereof; and your acceptance and receipt of the goods shipped hereunder shall constitute assent to such terms and conditions.
(b) The back of the Quotation contained provisions for remedies, warranties, and disclaimers. Paragraph 1 on the back page of the Quotation provided:

Agreement: This quotation is for immediate acceptance only, and is subject to change or withdrawal without notice at any time before orders are accepted by Seller. Clerical errors are subject to corrections. The order when accepted will constitute a contract on the Terms and Conditions appearing on the Seller's acknowledgement form as quoted below. Your order will constitute an agreement to these Terms and Conditions.
(c) Paragraph 3 on the back page of the Quotation provided:

Limitation of Liability: The seller[']s liability on any claim of any kind, including negligence and breach of warranty, for any loss or damage resulting from, arising out of, or connected with this contract, or from the performance or breach thereof, or from the manufacture, sales, delivery, resale, repair or use of any product covered by or furnished under this contract shall in no case exceed the price allocable to the product or part thereof which gives rise to the claim. In no event shall the seller be liable for special or consequential damages.
(d) Paragraph 4 on the back page of the Quotation provided:

Warranty: (a) Seller warrants title and that products sold to Buyer shall be free from defects in material and workmanship and shall conform to specifications for a period of eighteen (18) months from date of manufacture unless otherwise so stated in writing by Seller.
(e) Paragraph 5 on the back page of the Quotation further provides:

Warranty: The Seller undertakes that products sold hereunder to Buyer shall be free from defects in material and workmanship, and shall conform to specifications, for a period of 18 months from date of manufacture for complete units, and 60 days for parts or subassemblies. This express warranty is in lieu of and excludes all other warranties, guaranties or representations, express or implied, as to merchantability, fitness for particular purpose or any other matter. Upon receipt of definite shipping instructions, Buyer shall return, transportation prepaid all defective material or material not conforming to specifications, to Seller, after inspection by Seller, or at Seller's election subject to inspection by Seller. Material returned by Buyer must be returned in same condition as when received by Buyer. Defective material, or material not conforming to specifications, so returned shall be replaced or repaired by Seller and returned, freight prepaid, without any additional changes, or in lieu of such complaint or repair, Seller may, at Seller's option refund the purchase price applicable to such materials.... Seller's liability shall be limited solely to the replacement or repair or to refunding the purchase price applicable to defective material or material not meeting specifications. Seller shall not be liable for any consequential damages nor for loss, damages or expenses directly or indirectly arising from the use of the material.
(f) Paragraph 6 on the back page of the Quotation provided:

Advice by Seller: The giving or failure to give advice or recommendation of any character shall not impose any liability upon Seller....
*1516 19. Limitation of liability provisions in quotations, which allocate the risk of loss to purchasers by limiting purchasers' remedies, are frequently used in the heater industry. Cambridge uses similar language in its own sales contracts. Robertshaw would not have sold its controls to Cambridge without the disclaimers. Paragraph 4 on the front of the Quotation contains the disclaimer provision which Weerstra had discussed with Potter. After Potter received the quotation, he had a telephone conversation with Weerstra and discussed the language contained in paragraph 4 on the front of the quote.
20. Cambridge owns and operates an AGA certified testing laboratory on its premises and is the only heater manufacturer of its type in the industry with such facilities. It was Cambridge's practice to conduct in-application testing of its heaters' component parts before making the decision to install them. Cambridge relies on its in-application testing for determining the compatibility of component parts to its heaters. Usually, Cambridge does not rely on the component manufacturer to perform in-application testing.
21. It is the standard in the direct-fired gas furnace industry to perform in-application testing before general installation. The AGA requires a gas appliance manufacturer to test each component part in its application to determine whether it will work and whether it will be safe. ANSI standard 21.20 provides at § 1:1.5:
Compliance of an automatic gas ignition system or component with this standard does not imply that such a system or component of such a system is acceptable for use on gas appliances without supplemental tests with the device(s) applied to the particular appliance design.
Pl.Exh. 29 at p. 1. "In-application" testing is necessary to fully evaluate a component.
22. While Robertshaw engages in extensive testing of its controls before placing them on the market, Robertshaw told Cambridge that it did not know how its control would perform in Cambridge's heaters because it had never tested them in an application like Cambridge's. Before purchasing the Robertshaw controls, Cambridge did not ask Robertshaw to test its control in Cambridge's heaters and Robertshaw did not perform any such tests.
23. Before purchasing any Robertshaw controls, Cambridge's engineering department conducted its own testing on the Robertshaw HS780 control in a Cambridge heater to be sure that the control would work properly in its application. Potter directed Robert Reinkemeyer, another Cambridge engineer, to compare the Robertshaw control to the White-Rodgers control, to determine whether the Robertshaw control worked in Cambridge's application. After testing the Robertshaw control, Reinkemeyer reported to Potter:
My conclusion is that the Robertshaw control board will function properly in our equipment. There appears to be no functional difference between the White-Rodgers and Robertshaw control boards.
See Def.Exh. G.
24. Potter believed that Robertshaw's control was the functional equivalent of the White-Rodgers control when Cambridge initially purchased it from Robertshaw. Before purchasing the Robertshaw control, Cambridge did not ask Robertshaw to test its control in Cambridge's heaters.
25. In a letter dated June 9, 1988, Cambridge stated its intention to purchase 3,000 controls from Robertshaw over a three-year period. Cambridge began ordering Robertshaw controls in the Fall of 1988. Each time Robertshaw received an order from Cambridge for controls, Robertshaw sent Cambridge an order acknowledgement form. The terms of this form were not specifically discussed by Cambridge and Robertshaw.
26. Robertshaw sold 705 controls to Cambridge between October 31, 1988, and June 2, 1989.
27. Robertshaw obtained FM certification for its control in February 1989.
28. Cambridge installed the Robertshaw controls in three models of its direct-fired gas furnaces: the CH110AGA model, the CH115AGA model, and the CH120AGA model. Potter was the principal designer of these three models. Cambridge introduced *1517 the CH110 model heater for sale in the last quarter of 1987. It changed the design of the CH115 model from using a Fennewall spark ignition system to a hot surface ignition system sometime in 1987 or 1988. Cambridge first introduced the CH120 model for sale in July 1989.
29. In May 1989, Cambridge discovered what has been denominated the "quick cycle" phenomenon or anomaly. This phenomenon, which occurred in Cambridge's heaters which carried the Robertshaw module, occurred when there was a momentary electrical power cessation or interruption during a heating cycle. The gas valve spring action would close slowly and the flame would continue to burn the residual gas for a few seconds after the power was interrupted. When the power was restored before the flame was completely extinguished, the control turned the igniter on, but the igniter would not turn off at its regular interval because the remote control rod sensed the residual gas flame and bypassed the control's normal counting sequence for turning the igniter off. When this occurred, the igniter remained energized or hot during the remainder of the heating cycle. This "anomaly" occurred only when there was a very brief power outage of more than .1 and less than 3.0 seconds. When there were carbon deposits on the igniters in Cambridge's heaters which remained energized during a heating cycle, these igniters would burn out or break as a result of overheating.
30. Cambridge first reported the quick cycle phenomenon to Robertshaw in May 1989, after Cambridge had shipped approximately 400 of its heaters with Robertshaw controls to its customers. No one at Robertshaw had been aware of the quick cycle phenomenon until Cambridge reported it to Robertshaw. Shortly before May 22, 1989, Potter spoke with Robertshaw's salesman, Rich Little, about the phenomenon. Little reported the problem to Fred Geary. In a memorandum dated May 22, 1989, Little reported to Leon Spindler, Robertshaw's program manager for the HS780 control, what Geary told him and what Little had then told Potter:
After [I] mention[ed] the problem to Fred [Geary] he explained that in order to change the module we would have to re-write the micro-processor. I then explained to Gary Potter the situation and told him I did not think there was much we could do. Gary asked if we could take another look at this problem for the long term. In other words, if we would have to make changes to the module could we keep this problem in mind and correct this quick cycle problem.
Pl.Exh. 30. Copies of this memorandum were sent to Robertshaw officials, including Donald Naab, then vice-president of Robertshaw and head of the Simicon Division. Id. Fred Geary did not directly tell Gary Potter that the quick cycle phenomenon could be corrected with a change in any component microprocessor. The Robertshaw HS780 control does not contain a microprocessor.
31. On June 2, 1989, Gary Potter telephoned Leon Spindler and spoke with him about the quick cycle phenomenon. Potter asked what Robertshaw would do about it. Spindler then spoke with Geary about the problem. He asked Geary to test for the anomaly. Geary spent four days in Robertshaw's laboratory looking for a solution. He verified that the phenomenon could occur, but he could not find a solution at that time. Geary suggested to Spindler that the use of either a prepurge option or a local sense option, both standard options on Robertshaw controls, would resolve the anomaly at no additional cost. Geary told Spindler in June 1989 that, other than these two options, there was nothing Robertshaw could do to fix the quick cycle phenomenon at that time, other than to redesign the control, which Robertshaw would not do.
32. After speaking with Geary, Spindler telephoned Potter on June 6, 1989. During that conversation, Spindler suggested that Cambridge try another version of the Robertshaw control, a pre-purge version. The pre-purge version of the Robertshaw control would have eliminated the quick cycle phenomenon without additional cost. Potter rejected the pre-purge option, because it would require the heater to force out unheated air for 17 seconds. Potter believed his superior *1518 would have objected to the 17-second period of cold air coming into the customer's ceiling area.
33. Spindler also suggested to Potter that the quick cycle phenomenon could be eliminated if Cambridge added a local sensor option, another option available on all Robertshaw controls. Potter rejected that suggestion also. Spindler then told Potter that Robertshaw could not offer any other solution to the quick cycle phenomenon. Potter told Spindler that, if AGA identifies the phenomenon as a safety issue, he would have to drop Robertshaw's controls from their heaters.
34. Although Potter knew of the quick cycle phenomenon and knew Robertshaw was not going to correct the problem by redesigning its controls, Potter ordered an additional 1,260 controls between July 13, 1989, and March 1990 and installed them in Cambridge's heaters. Between June 2, 1989, and January 31, 1990, Cambridge shipped approximately 990 heaters with Robertshaw controls to its customers for installation throughout the country.
35. In December 1989, Cambridge customers began reporting a substantial number of igniter failures in its furnaces which caused the heaters to shut down.
36. In January 1990, Cambridge informed Robertshaw that its customers were experiencing igniter failures and attributed the problem to the quick cycle phenomenon.
37. Also, in January 1990, Cambridge determined that the quick cycle phenomenon could be corrected by adding a time-delay relay switch on the output of the control going to the igniter which limited the time the igniter would stay on to 30 seconds. Thereafter, Cambridge incorporated these time delay relay switches into all the CH110, CH115, and CH120 model heaters it produced at its factory that used Robertshaw control modules.
38. On February 20, 1990, Potter telephoned Spindler and reported the problems Cambridge's customers were experiencing. Potter stated that, when a short electrical interruption occurred and flame was still present in the heater burner, and then the power was reapplied, the igniter would stay on until the thermostat turned off. In the Cambridge heaters unignited gases are present around the igniter. These gases cause carbon to be absorbed into the hot silicon igniter material. The electricity continues to increase, causing either the fuse to blow, the igniter to destroy itself, the coil on the HS780 to burn open, or the relay to fail. Potter told Spindler he had added a time-delay relay that is energized from the igniter drive of the HS780. The contacts of the relay then drive the igniter. In the customers' heaters, the time-delay relay completely cured the problem. Potter asked what portion of these repairs Robertshaw would pay for. Spindler told Potter none of his other customers were experiencing the same problem.
39. In February 1990, Cambridge began a national "retrofit program" at its customers' locations to fix a number of items on their heaters, including the quick cycle phenomenon. As a part of that program, Cambridge fixed twelve items on its CH110, CH115, and CH120 heaters. Most of the items which were repaired in the retrofit program were unrelated to the quick cycle phenomenon and the Robertshaw control. Only Item 3 of the retrofit program, the installation of a 30 second time-delay relay, related to the Robertshaw control and the quick cycle phenomenon.
40. Cambridge made repairs on 1,459 heaters during the retrofit program. Some of these units initially contained White-Rodgers controls.
41. Although not part of the written retrofit program, during the period of the retrofit program, Cambridge also switched from using I 2R igniters to Norton igniters and changed the igniters in all of the furnaces manufactured during the retrofit program.
42. In a letter to Potter dated March 1, 1990, Robertshaw offered to try and work with Cambridge to resolve the problems. In part, the letter stated:
In speaking to Leon Spindler, he has identified a way to solve the problem with a modification of our existing designs. We can accommodate your needs by making a *1519 new layout incorporating your requested change to the control. Due to agency issues and printed circuit board lead time, it will take up to six months for production availability. This will eliminate the need for your time-delay relay.
Pl.Exh. 41.
43. Cambridge rejected Robertshaw's offer to work with Cambridge and on March 2, 1990, cancelled the purchase contract with Robertshaw.
44. Thereafter, Potter asked Little for Robertshaw's customer list because he did not believe Robertshaw's claim that no other customer was experiencing similar problems. Potter told Little, "I'm going to find out who else is having these problems and we are going to come after Robertshaw." Pl.Exh. 47; Def. Exh. Z. Potter contacted Robertshaw customers but was unable to locate one who had experienced the quick cycle phenomenon.
45. Cambridge never requested that Robertshaw refund the purchase price of the controls. Robertshaw offered to refund the purchase price of the controls after the commencement of this lawsuit.
46. The Court is not persuaded by the evidence that Robertshaw or the quick cycle phenomenon was responsible for the problems experienced by Cambridge's customers. Evidence indicated that these problems could have been caused by one or more other factors. There was no persuasive evidence of any power failure at a Cambridge customer location which caused the customer's heater failure to occur.
47. The Robertshaw control modules themselves did not fail and did not need to be repaired, except in a few instances.
48. Robertshaw has sold between 150,000 and 200,000 HS780 controls per year. Robertshaw has never received any complaint from customers other than Cambridge about the quick cycle phenomenon.
49. Robertshaw tested its controls in numerous different conditions and received AGA certification, but never observed the quick cycle phenomenon.
50. After Cambridge cancelled its contract with Robertshaw, Robertshaw discovered a temporary method for correcting an important safety problem reported by a European customer which might have resolved Cambridge's problem. This method involved the use of an orange wire which connected contact R-11 to the time counter.
51. In May 1990, Geary received a telephone call from Potter wherein Potter berated him. At that time, Geary did not have a solution for Cambridge's problem. After his conversation with Potter, Geary made a prototype layout of the European customer correction, which involved a redesign of the circuit board. During the time that Geary was redesigning the board for the European customer, he concluded for the first time that this same redesign would solve Cambridge's quick cycle problem. Geary reported to Spindler that this board redesign would solve the Cambridge problem. Spindler said it was too late, that Cambridge had already done a retrofit, and that they were going to sue Robertshaw.
52. In the Fall of 1990, Robertshaw received reports from one of its major customers, Suburban, about several problems that Suburban experienced with the HS780 control. The first was a problem which Suburban experienced in laboratory tests when a lab technician draped a lead to the flame sense rod over the igniter. The second was a problem with a remote sensor grounding out against a gas manifold. An "orange wire fix," similar to the European temporary correction, was implemented as a temporary solution to the Suburban problems. In 1991, Robertshaw finished redesigning the board to permanently implement the temporary orange wire fix.

DISCUSSION
Remaining for determination are plaintiff's claims of fraud and breach of express warranty. The subject matter jurisdiction of the Court is founded upon the citizenship of the parties and the amount in controversy, as granted by 28 U.S.C. § 1332. In such a case the Court must apply the substantive rules of decision which the Missouri state courts would apply. Klaxon Co. v. Stentor Electric *1520 Mfg. Co., Inc., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941); Birnstill v. Home Savings of America, 907 F.2d 795, 797 (8th Cir.1990). The parties have referred the Court to the law of Missouri.

Count V. Fraud.
Plaintiff argues that defendant made several fraudulent misrepresentations to it. On this claim, plaintiff must bear a heavy, although reasonably borne, burden. Empire Gas Corp. v. Small's LP Gas Co., 637 S.W.2d 239, 242 (Mo.Ct.App.1982). To prove fraud, plaintiff must establish each of the following: (1) a representation, (2) which is false; (3) and material; (4) the speaker's knowledge of its falsity, or his ignorance of the truth; (5) the speaker's intention that the representation be acted on by the plaintiff in a manner reasonably contemplated; (6) the plaintiff's ignorance of the falsity of the representation; (7) the plaintiff's reliance on the representation being true; (8) the plaintiff's right to rely on it; and (9) the plaintiff's damages proximately caused by the misrepresentation. Paul v. Farmland Industries, Inc., 37 F.3d 1274, 1276-77 (8th Cir.1994), cert. denied, 514 U.S. 1017, 115 S.Ct. 1360, 131 L.Ed.2d 217 (1995); Heberer v. Shell Oil Co., 744 S.W.2d 441, 443 (Mo.1988) (en banc); Citizens Bank of Appleton City v. Schapeler, 869 S.W.2d 120, 127 (Mo.Ct.App.1993); Mo.App. Inst. (MAI) 23.05, at 291 (4th ed.).
First, plaintiff argues that defendant told plaintiff's Gary Potter that the quick cycle phenomenon could be corrected only through a rewriting of the microprocessor component of the control, which would take several months to accomplish because the microprocessors come from overseas. While defendant's salesman, Rich Little, had a conversation with Potter in which he stated that Fred Geary had told him that the problem required the correction of a microprocessor, Geary made no such statement to Potter. Thereafter, in the conversation of June 6, 1989, defendant's Spindler made it clear to Potter that, aside from offering the prepurge and local sensor options of the Robertshaw controls, both of which Potter rejected, no other solution would be offered by Robertshaw. Potter could not reasonably understand these statements to leave open any earlier indication by Robertshaw that a long-range solution, in the form of a modification of a microprocessor or in some other form, would be pursued or would be forthcoming. This is indicated by Potter's statement that, if the quick cycle phenomenon was seen by AGA as a safety problem, Cambridge would drop Robertshaw's controls from the Cambridge heaters. After June 6, 1989, plaintiff could not have reasonably relied upon any statement that Rich Little made to Gary Potter about any solution involving the redesign of a microprocessor.
Next, plaintiff argues that defendant misrepresented that its control was the functional equivalent of the White-Rodgers control module. The Court has found in Finding No. 12, above, that defendant did not make such a statement to plaintiff. Rather, Potter came to this conclusion after plaintiff's own engineer performed comparison testing and reported the results to him. This claim is factually meritless.
Next, plaintiff argues that defendant misrepresented that its ignition control modules would comply with specifications and that they would remain energized only during the short period of time necessary to ignite the natural gas fuel. More specifically, plaintiff argues that, prior to purchasing the Robertshaw control, Potter received a copy of the Grayson brochure and read all eight pages of it. Plaintiff also argues that the document "specifies" in its first paragraph that, when power is supplied to the control, the igniter will begin to glow after a few seconds, that thereafter the gas valve is opened, supplying gas to the burner, and that after several seconds the igniter is turned off. The relevant portion of the document states:
The system acts on a demand for heat by a switch or thermostat to supply power to the ignition control.... After several seconds the ignitor will begin to glow, and in approximately 34 seconds the gas valve is opened supplying gas to the main burner. After several seconds the ignitor is turned off and the sensor is energized.
*1521 Defendant argues that this statement is an accurate description of how the Robertshaw control works in a normal heating cycle. The Court agrees that there is nothing untrue about this statement and that it clearly describes the operation of the control in a normal cycle initiated by a signal from the switch or thermostat. It is equally true that the document does not refer to the abnormal situation when a control is not energized by the thermostat or switch calling for heat. The quick cycle anomaly is an abnormal situation that is not described in or referenced in the document, by implication or otherwise.
When there is a power interruption of more than .1 second but less than 3.0 seconds, the thermostat or switch, like the control, loses electrical energy and cannot turn off and then demand heat when power is restored. Instead, when the power interruption ends, the power is supplied or resupplied by the outside power source without any activation or change by the thermostat or switch. Thus, the statement in the document is not false or fraudulent.
Next, plaintiff argues that defendant fraudulently concealed from plaintiff the fact that, if igniters remain powered in the presence of natural gas fuel, they will fail more quickly than if they were not in the presence of gas. To recover for fraudulent concealment, plaintiff must establish that defendant had a legal duty to disclose the subject information, which it then failed to disclose. See Kansas City Downtown Minority Dev. Corp. v. Corrigan Associates, Ltd. Partnership, 868 S.W.2d 210, 219 (Mo.Ct.App.1994); Centerre Bank of Independence, N.A. v. Bliss, 765 S.W.2d 276, 284 (Mo.Ct.App.1988). In addition, plaintiff must prove with clear and convincing evidence the same nine elements required to establish a fraudulent misrepresentation. Weston v. Donnelly, 927 F.2d 369, 371 (8th Cir.1991); Kansas City Downtown Minority Dev. Corp., 868 S.W.2d at 219.
The Court agrees with defendant that plaintiff failed to establish that defendant had a duty to disclose to plaintiff the quick cycle phenomenon's effect on its igniters. A duty to disclose does not generally arise in a commercial transaction. See Pandjiris, Inc. v. Sunshine Stainless Tank & Equipment Co., 655 F.Supp. 473, 474 (E.D.Mo.1987). A duty to disclose only arises where there is an inequality of the positions of the parties; there is a fiduciary relationship between the parties; or one of the parties possesses superior knowledge not within the fair and reasonable reach of the other party. Id.; see also Blaine v. J.E. Jones Construction Co., 841 S.W.2d 703, 707 (Mo.Ct.App.1992).
A plaintiff claiming its opponent has superior knowledge must show the plaintiff's inability to discover the undisclosed information in the exercise of reasonable diligence. Mobley v. Copeland, 828 S.W.2d 717, 724 (Mo.Ct.App.1992); Fairmont Foods Co. v. Skelly Oil Co., 616 S.W.2d 548, 550 (Mo.Ct. App.1981). Plaintiff has failed to do this. The transaction between plaintiff and defendant was an ordinary sales transaction. Nothing in the record establishes that plaintiff, who produces and sells heaters, and who alone among its competitors has a certified testing facility, could not have discovered such a problematic condition in the exercise of reasonable diligence. The Court also agrees that common sense dictates that, if igniters stay on longer in the presence of fuel, they would burn out faster.
Further, on this claim, plaintiff has failed to persuade the Court that defendant deliberately took action to suppress any such information. DeRousse v. PPG Industries, Inc., 598 S.W.2d 106, 109, 110 (Mo.1980) (en banc); Alexander v. Johnson Furnace Co., 543 S.W.2d 539, 542 (Mo.Ct.App.1976). Plaintiff has also failed to persuade the Court that it reasonably relied on defendant's silence with respect to the possible side effects of the quick cycle anomaly in plaintiff's furnaces.
For these reasons, judgment will be for defendant on plaintiff's Count V claims.

Count VI. Express Warranty.
Plaintiff next argues that it is entitled to relief for breach of three express warranties: (1) that the Robertshaw control would be the "functional equivalent" of or "direct replacement" of the White-Rodgers control; (2) that *1522 the control would "conform to specifications;" and (3) that Robertshaw would replace or repair defective materials or workmanship, or refund the purchase price of the control.
An express warranty is created by
[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain ... that the goods shall conform to the affirmation or promise.
See Mo.Rev.Stat. § 400.2-313(1)(a). To establish a breach of an express warranty, Cambridge must prove:
1. defendant's sale of the goods to plaintiff;
2. defendant's representation to plaintiff that the goods were of certain kind or quality;
3. defendant's representation induced plaintiff's purchase of, or was a material factor in plaintiff's decision to purchase the goods;
4. nonconformity of the goods to the representations made;
5. plaintiff's notice to defendant, within a reasonable time of discovery of the goods' nonconformity, of such failure to conform; and
6. plaintiff's damages.
Carpenter v. Chrysler Corp., 853 S.W.2d 346, 357 (Mo.Ct.App.1993).
Plaintiff's claim that, before plaintiff and defendant entered into their contract, Rich Little orally warranted to Cambridge that the Robertshaw control was the "direct replacement" for and the "functional equivalent" of the White-Rodgers control is without merit. The Court has found as a matter of fact that no one at defendant told plaintiff that the Robertshaw control was the functional equivalent of or the direct replacement of the White-Rodgers control. This warranty claim fails for lack of a factual basis that the asserted affirmation or promise was made.
Plaintiff next argues that defendant stated in the contractual documents that the controls would conform to "specifications" or "published specifications." An express warranty can incorporate the characteristics of specifications. Interstate Folding Box Co. v. Hodge Chile Co., 334 S.W.2d 408, 415 (Mo.Ct. App.1960). Plaintiff argues that defendant failed to provide a control that conformed to the specifications because the specifications did not describe the short cycle anomaly as one of the control's characteristics and the controls were defective in this way.
The Court agrees with defendant that to understand the agreement between the parties as to the warranty language in the contract, it is important to review the contract negotiations. Plaintiff contacted defendant when White-Rodgers, its prior control module vendor, would not pay for FM certification for its controls. During the discussions with Potter, Weerstra, Robertshaw's Product Manager for the HS780, expressed concerns about the suitability of the control for Cambridge's application. Accordingly, Weerstra informed Potter that he would only agree to sell the control to plaintiff if the contract contained a disclaimer. Defendant prepared a quotation document which included disclaimer language, at paragraph 4 on the first page of the quotation (Paragraph 4). Paragraph 4 provided:
Robertshaw Controls Company will supply the specified control to published specifications and is not responsible for the suitability of the control to any specific application by its customers.
The quotation was an offer which was accepted by plaintiff, thereby creating a written contact between the parties. Boese-Hilburn Co. v. Dean Machinery Co., 616 S.W.2d 520, 524 (Mo.Ct.App.1981).
In Paragraph 4, defendant agreed to supply the specified control to published specifications, but disclaimed any responsibility for the suitability of the control to any specific application by Cambridge. The Court agrees that the provisions of paragraph 4 of the original quotation bound the parties and applicable each time defendant received an order from plaintiff and defendant responded with an Order Acknowledgement Form.
The next issue for the Court to resolve is what the parties meant by the term "specifications," as used in the quotation document. Since the parties never discussed this subject, *1523 the Court can only look to the documents in evidence to resolve the issue.
Defendant argues that the only "specification," published or otherwise, for the HS780 control was the Simicon Division's engineering specifications, Pl.Exh. 27. Exhibit 27 was the specification which Robertshaw sent to AGA for testing and approval. Cambridge does not allege a breach of the specifications contained in Pl.Exh. 27. The controls it purchased conformed with that document.
Plaintiff argues that Pl.Exh. 25, the Grayson Division document, is a "specification," and that the HS780 controls did not conform to that specification because it did not include the quick cycle phenomenon as a characteristic of the controls. Defendant argues that the only reasonable conclusion from reading the document is that the Grayson brochure is advertising literature, not a specification. The Court disagrees with defendant.
In the contractual documents between the parties, the term "specifications" is not expressly defined. Thus, the Court must apply the principles of contract construction as found in the law of Missouri. In doing so, the Court looks to the ordinary, non-specialized meaning of the term. J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club of Columbia, Mo., 491 S.W.2d 261, 264 (Mo.1973) (en banc). The ordinary meaning of "specifications" is "a detailed description or assessment of requirements, dimensions, materials, etc., as of a proposed building, machine, bridge, etc." See Random House Compact Unabridged Dictionary, at 1822 (Spec. 2nd ed.1996); see also State Bank of Freeport v. Cape Girardeau & Chester R.R. Co., 172 Mo.App. 662, 674, 155 S.W. 1111 (1913) (specifications include documents with a description of an item sufficient to indicate how the item is to be built); Fairbanks, Morse & Co. v. Consolid. Fisheries Co., 190 F.2d 817, 822 (3d Cir.1951) (specifications are "universally defined as a detailed and exact description of the subject matter of the contract"); Brooks v. Smith, 269 S.W.2d 259, 260 (Ky.1954) (in a building construction contract, "specifications" ordinarily means a detailed description of the building to be constructed, including the manner of construction and the materials to be used).
Defendant would limit "specifications" to those documents sufficiently descriptive to enable an outside underwriter, such as FM, to test the object. However, it is clear to the Court that the ordinary meaning of the term "specifications" used by the parties in their contractual documents included documents which relate to other purposes, such as the construction or maintenance of a product as well as the assessment of its performance. Thus it is that the Court concludes that the Grayson Division Unilogic V document, published by defendant in May 1986 is sufficiently definitive and descriptive of the HS780 control to be considered a set of "specifications" within the meaning of the quotation which defendant issued. So also is the Circuit Operational Description, Pl.Exh. 26, sufficiently definitive and descriptive of the HS780 control to be a specification, even though its purpose may have been only to educate defendant's sales personnel.
Defendant argues that the HS780 control conforms to the language used in these documents. Defendant argues, and the Court agrees, that these documents accurately describe how the control functions in normal operation when it is energized by a thermostat or a switch. They do not describe what happens when the control is energized by a power surge following a brief power interruption, such as would occur during a quick cycle anomaly. Specifically, the Circuit Operational Description stated that, when a momentary power interruption occurs, "the control will reset back to its beginning condition of count 1, and resume operation as if the thermostat had just been closed for the first time." Pl.Exh. 26, at 8. When the quick cycle anomaly occurs, the control resets to count 1 and when power is returned, resumes operation as if the thermostat had just been closed for the first time by energizing the igniter. Thereafter, when the igniter is energized, the quick cycle problem can occur, if there is still sufficient flame in the burner when the power is restored to enable the remote sense rod to detect flame before the igniter completes its cycle. This early flame detection then causes the control to skip the subsequent counts after count 1 *1524 that would normally turn the igniter off after a six-second warm up and six-second try for ignition. No evidence indicated that Fred Geary, the designer of the control and author of Pl.Exh. 26, knew that the quick cycle phenomenon existed until it was reported to Spindler by Potter in May 1989, a year after Pl.Exh. 26 was issued.
Plaintiff, therefore, bases liability not on what the documents provide, but on what they do not provide. The law is clear that Cambridge may not recover under this theory because "omissions are not affirmative representations of any sort and thus cannot support a warranty claim, because express warranties must be explicit." Sidco Products Marketing, Inc. v. Gulf Oil Corp., 858 F.2d 1095, 1099 (5th Cir.1988).
Finally, plaintiff argues that defendant expressly warranted that defective material would be repaired or replaced or the purchase price would be refunded. Plaintiff refers to Paragraph 5 from the back of the Quotation which provides in relevant part:
the Seller undertakes that products sold hereunder to Buyer shall be free from defects in material and workmanship, and shall conform to specifications, for a period of 18 months from date of manufacture for complete units, and 60 days for parts and sub-assemblies ... upon receipt of definite shipping instructions, Buyer shall return, transportation prepaid, all defective materials or material not conforming to specifications, to Seller, after inspection by Seller, or at Seller's election subject to inspection by Seller. Material returned by Buyer must be returned in same condition as when received by Buyer. Defective material or material not conforming to specifications, so returned, shall be replaced or repaired by Seller, freight prepaid, without any additional charge, or in lieu of such replacement or repair, Seller may, at Seller's option, refund the purchase price applicable to such material.
Plaintiff has failed to prove that the HS780 control modules failed on account of defects in their material or workmanship. Rather, the quick cycle problems may have resulted from the design of the control's circuit. This situation is similar to the claim rejected in Hathaway v. Cedarburg Mut. Ins. Co., 177 Wis.2d 728, 503 N.W.2d 5 (App. 1993). In Hathaway, a truss system was used in the construction of a two story house. The house collapsed and the plaintiff argued that the defective truss system caused the collapse. The court ruled that the truss system was not "defective material" within the meaning of the homeowner's policy provision covering collapse caused by defective material. Id. 503 N.W.2d at 7. Rather, the collapse was the result of a design defect which failed to properly account for the maximum weight that the truss system was capable of supporting. Id.
Likewise, Robertshaw's controls did not contain defective materials or workmanship. Before they entered into the contract, defendant advised plaintiff that the controls might not be suitable for use in its furnaces. Nevertheless, plaintiff bought the controls, assuming the risk of unsuitability, because defendant was willing to pay for FM certification.
Next, even if they were originally a part of the bargain, Pls. Exhs. 25 and 26 were no longer part of that bargain by June 1989, when Cambridge continued to order controls after it learned of the short cycle anomaly. Royal Business Machines, Inc. v. Lorraine Corp., 633 F.2d 34 (7th Cir.1980), is analogous. Therein, the court noted that the case for breach of express warranty involved a series of sales transactions between the same parties over approximately 18 months and concerned two different machines. The situations of the parties, their knowledge and reliance, may be expected to change in light of their experience during that time. An affirmation of fact which the buyer from his experience learned to be untrue cannot form a part of the basis of the bargain. The same representations that could have constituted an express warranty earlier in the series of transactions would not continue as an express warranty in a later transaction, if the buyer acquired knowledge contradicting the fact earlier asserted. Id. at 44.
Finally, Cambridge failed to prove that it complied with a necessary condition precedent to its breach of warranty claim. *1525 Section 4 on the back of the quotation provides that if there is a defect, Cambridge must return the controls to Robertshaw. There is no evidence that Cambridge complied with that requirement. By failing to return the controls to Robertshaw for repair, replacement, or refund during the warranty period, Cambridge's breach of express warranty claim is barred. Gross v. Systems Engineering Corp., 36 U.C.C. Rep.Serv. 42, 1983 WL 160568 (E.D.Pa.1983).
For these reasons, judgment on the Count VI claims will be for defendant. An appropriate judgment is issued herewith.

JUDGMENT
This action was tried to the Court sitting without a jury, the undersigned United States Magistrate Judge presiding by consent of the parties under 28 U.S.C. § 636(c)(3). The Court having made and rendered its findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52(a),
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that plaintiff Cambridge Engineering, Inc., have and recover nothing from defendant Robertshaw Controls Company. The action is dismissed with prejudice. Plaintiff shall pay the costs of the action.